# EXHIBIT - A

**EXECUTION COPY**

---

**AMENDED AND RESTATED**

**NOTE PURCHASE AGREEMENT**

**DATED MARCH 1, 2005**

**AMONG**

**BRANTLEY MEZZANINE FINANCE, LLC**

**AND**

**COLUMBUS COMPONENTS GROUP, LLC**

---

**<u>TABLE OF CONTENTS</u>**

1. DEFINITIONS...............................................................................................1
   1.1 Accounting Terms.................................................................................1
   1.2 General Terms......................................................................................2
   1.3 Uniform Commercial Code Terms. ......................................................13
   1.4 Certain Matters of Construction...........................................................13

2. AUTHORIZATION AND CLOSING.........................................................13
   2.1 Authorization of the Note. ...................................................................13
   2.2 Purchase and Sale of the Note. ............................................................14
   2.3 Closing Fee. ........................................................................................14
   2.4 The Closing. ........................................................................................14

3. TERMS OF THE NOTE. .............................................................................14
   3.1 Interest.................................................................................................14
   3.2 Redemption; Repurchase. ....................................................................15
   3.3 Payments. ............................................................................................15
   3.4 Certain Taxes. .....................................................................................16
   3.5 Transfer and Exchange of the Note. .....................................................17
   3.6 Replacement of Notes. ........................................................................17
   3.7 Ranking. ..............................................................................................17
   3.8 Use of Proceeds...................................................................................18

4. COLLATERAL:  GENERAL TERMS. ......................................................18
   4.1 Security Interest in the Collateral. .......................................................18
   4.2 Perfection of Security Interest..............................................................18
   4.3 Disposition of Collateral. ....................................................................19
   4.4 Preservation of Collateral. ...................................................................19
   4.5 Ownership of Collateral. .....................................................................20
   4.6 Defense of Purchaser's Interests..........................................................20
   4.7 Books and Records. .............................................................................21
   4.8 Financial Disclosure............................................................................21
   4.9 Compliance with Laws. .......................................................................21
   4.10 Inspection of Premises. .......................................................................22
   4.11 Insurance. ............................................................................................22
   4.12 Failure to Pay Insurance. .....................................................................24
   4.13 Payment of Taxes. ...............................................................................24
   4.14 Payment of Leasehold Obligations. .....................................................24
   4.15 Receivables. ........................................................................................25
   4.16 Maintenance of Equipment. .................................................................26
   4.17 Exculpation of Liability. ......................................................................26
   4.18 Environmental Matters.........................................................................27
   4.19 Financing Statements. ..........................................................................29

5.      REPRESENTATIONS AND WARRANTIES.................................................29
        5.1     Authority...........................................................................29
        5.2     Formation and Qualification..............................................30
        5.3     Capitalization and Related Matters.....................................30
        5.4     Governmental Authorization; Other Consents.......................31
        5.5     Survival of Representations and Warranties..........................31
        5.6     Tax Returns........................................................................31
        5.7     Financial Statements..........................................................32
        5.8     Corporate Name..................................................................32
        5.9     O.S.H.A. and Environmental Compliance...............................32
        5.10    Solvency; No Litigation, Violation, Indebtedness or Default....33
        5.11    Patents, Trademarks, Copyrights and Licenses. ...................34
        5.12    Licenses and Permits..........................................................34
        5.13    Default of Indebtedness......................................................35
        5.14    No Default...........................................................................35
        5.15    No Burdensome Restrictions.................................................35
        5.16    No Labor Disputes................................................................35
        5.17    Margin Regulations.............................................................35
        5.18    Investment Company Act. ....................................................35
        5.19    Public Utility Holding Company Act. ....................................36
        5.20    Acquisition Agreement.........................................................36
        5.21    No Business.........................................................................36
        5.22    Disclosure...........................................................................36
        5.23    Hedging Contracts...............................................................36
        5.24    Conflicting Agreements........................................................36
        5.25    Application of Certain Laws and Regulations. ......................37
        5.26    Business and Property of the Company.................................37
        5.27    Anti-Terrorism Laws. ..........................................................37

6.      AFFIRMATIVE COVENANTS. ........................................................38
        6.1     Conduct of Business and Maintenance of Existence and Assets...........38
        6.2     Attendance at Board and Member Meetings. ........................38
        6.3     Violations............................................................................39
        6.4     Adjusted Net Worth..............................................................39
        6.5     Fixed Charge Coverage Ratio................................................39
        6.6     Leverage Ratio.....................................................................39
        6.7     Interest Coverage Ratio........................................................40
        6.8     Execution of Supplemental Instruments. ..............................41
        6.9     Payment of Indebtedness.....................................................41
        6.10    Standards of Financial Statements.......................................41
        6.11    Anti-Terrorism Laws. ..........................................................41
        6.12    Minority Business Status. ....................................................42

7.      NEGATIVE COVENANTS. ..............................................................42
        7.1     Merger, Consolidation, Acquisition and Sale of Assets. .........42
        7.2     Liens...................................................................................43

-ii-

7.3     Guarantees........................................................................................43
7.4     Limitation on Layering.....................................................................43
7.5     Legal Name, State of Formation and Form of Entity. ......................43
7.6     Investments.......................................................................................43
7.7     Loans.................................................................................................43
7.8     Capital Expenditures.........................................................................44
7.9     Dividends...........................................................................................44
7.10    Indebtedness......................................................................................44
7.11    Nature of Business............................................................................44
7.12    Transactions with Affiliates..............................................................45
7.13    Leases.................................................................................................45
7.14    Press Release; Public Offering Materials. ........................................45
7.15    Sale-Leasebacks................................................................................45
7.16    Subsidiaries.......................................................................................46
7.17    Fiscal Year and Accounting Changes. ..............................................46
7.18    Pledge of Credit. ...............................................................................46
7.19    Amendment of Articles of Organization or Operating Agreement. .....46
7.20    Compliance with ERISA...................................................................46
7.21    Prepayment of Indebtedness; Management Fees. .............................47
7.22    Use of Proceeds.................................................................................47
7.23    Accountants and Attorneys. ..............................................................47
7.24    Business Plan. ...................................................................................47

8.    CONDITIONS PRECEDENT. ....................................................................47
      8.1     Conditions to Closing. ......................................................................47

9.    INFORMATION AS TO THE COMPANY. ................................................52
      9.1     Disclosure of Material Matters. ........................................................52
      9.2     Environmental Reports. ....................................................................52
      9.3     Litigation...........................................................................................52
      9.4     Material Occurrences. .......................................................................52
      9.5     Annual Financial Statements. ...........................................................53
      9.6     Monthly Financial Statements. .........................................................53
      9.7     Other Reports.....................................................................................53
      9.8     Additional Information. .....................................................................54
      9.9     Projected Operating Budget. .............................................................54
      9.10    Notice of Suits, Adverse Events. ......................................................54
      9.11    ERISA Notices and Requests............................................................54
      9.12    Borrowing Base Certificate...............................................................55
      9.13    Additional Documents. .....................................................................55

10.   EVENTS OF DEFAULT................................................................................55
      10.1    Payment of Obligations.....................................................................55
      10.2    Misrepresentations.............................................................................55
      10.3    Failure to Furnish Information. .........................................................56
      10.4    Liens Against Assets..........................................................................56

|   | 10.5 | Breach of Covenants. | 56 |
|   | 10.6 | Judgment. | 56 |
|   | 10.7 | Insolvency and Related Proceedings of the Company. | 56 |
|   | 10.8 | Insolvency; Cessation of Operations. | 56 |
|   | 10.9 | Bankruptcy. | 57 |
|   | 10.10 | Material Adverse Effect. | 57 |
|   | 10.11 | Loss of Priority Lien. | 57 |
|   | 10.12 | Breach of Material Agreements. | 57 |
|   | 10.13 | Cross Default; Cross Acceleration. | 57 |
|   | 10.14 | Change of Control. | 57 |
|   | 10.15 | Invalidity of Credit Agreement. | 57 |
|   | 10.16 | Loss of Material Intellectual Property. | 58 |
|   | 10.17 | Destruction of Collateral. | 58 |
|   | 10.18 | Business Interruption. | 58 |
|   | 10.19 | ERISA Events. | 58 |
| 11. | | PURCHASER'S RIGHTS AND REMEDIES AFTER DEFAULT. | 58 |
|   | 11.1 | Rights and Remedies. | 58 |
|   | 11.2 | Purchaser's Discretion. | 59 |
|   | 11.3 | Setoff. | 59 |
|   | 11.4 | Rights and Remedies not Exclusive. | 60 |
|   | 11.5 | Allocation of Payments After Event of Default. | 60 |
| 12. | | WAIVERS AND JUDICIAL PROCEEDINGS. | 60 |
|   | 12.1 | Waiver of Notice. | 60 |
|   | 12.2 | Delay. | 61 |
|   | 12.3 | Jury Waiver. | 61 |
| 13. | | EFFECTIVE DATE AND TERMINATION. | 61 |
|   | 13.1 | Term. | 61 |
|   | 13.2 | Termination. | 61 |
| 14. | | [INTENTIONALLY OMITTED] | 62 |
| 15. | | [INTENTIONALLY OMITTED] | 62 |
| 16. | | MISCELLANEOUS. | 62 |
|   | 16.1 | Governing Law. | 62 |
|   | 16.2 | Entire Understanding. | 62 |
|   | 16.3 | Transfers and Assignments. | 63 |
|   | 16.4 | Application of Payments. | 63 |
|   | 16.5 | Indemnity. | 64 |
|   | 16.6 | Notice. | 64 |
|   | 16.7 | Survival. | 65 |
|   | 16.8 | Severability. | 65 |

| | | |
|---|---|---|
| 16.9 | Expenses. | 65 |
| 16.10 | Injunctive Relief. | 66 |
| 16.11 | Consequential Damages. | 66 |
| 16.12 | Captions. | 66 |
| 16.13 | Counterparts; Telecopied Signatures. | 66 |
| 16.14 | Construction. | 66 |
| 16.15 | Confidentiality; Sharing Information. | 66 |
| 16.16 | Publicity. | 67 |

# AMENDED AND RESTATED
## NOTE PURCHASE AGREEMENT

THIS AMENDED AND RESTATED AGREEMENT is made as of March 1, 2005, by and between Columbus Components Group, LLC, an Ohio limited liability company (the "Company"), and Brantley Mezzanine Finance, LLC, a Maryland limited partnership ("Brantley" and the "Purchaser").

## RECITALS

A.    The Purchaser and the Company are parties to a certain Note Purchase Agreement dated as of December 9, 2004 (the "Existing Purchase Agreement") pursuant to which the Company obtained financing from the Purchaser by selling to Purchaser the Note.

B.    The Purchaser and the Company have agreed to amend and restate the Existing Purchase Agreement in order to amend certain terms of the Existing Purchase Agreement.

C.    It is the intent of the parties hereto that this Agreement not constitute a novation of the obligations and liabilities existing under the Existing Purchase Agreement or evidence payment of any such obligations and liabilities, that this Agreement amend and restate in its entirety the Existing Purchase Agreement, and that from and after the date hereof the Existing Purchase Agreement be of no further force or effect except to evidence the incurrence of the obligations of the parties thereto thereunder and the representations and warranties made thereunder.

NOW THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the receipt and sufficiency of which are hereby acknowledged, the Company and the Purchaser hereby agree as follows:

1.    DEFINITIONS.

1.1    Accounting Terms.

As used in this Agreement, the Note, or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined in Section 1.2 or elsewhere in this Agreement and accounting terms partly defined in Section 1.2 to the extent not defined shall have the respective meanings given to them under GAAP; provided, however, whenever such accounting terms are used for the purposes of determining compliance with financial covenants in this Agreement, such accounting terms shall be defined in accordance with GAAP.   All financial computations to be made under this Agreement shall, unless otherwise specifically provided herein, be made in accordance with GAAP applied on a basis consistent in all material respects with the financial statements delivered to the Purchaser on or prior to the Closing Date, but without adjusting for changes in GAAP after the Closing Date.  In the event of any change in GAAP after the Closing Date, and if but for such change the Company would be in compliance with the financial covenants set forth in Sections 6.4, 6.5, 6.6 and 6.7, the parties will endeavor, in good faith, to agree upon an amendment to this Agreement that would adjust

such financial covenants in a manner that would not affect the substance thereof, but any such agreement shall not become effective until an amendment is consummated in accordance with Section 16.2(b).

     1.2     <u>General Terms</u>.

For purposes of this Agreement the following terms shall have the following meanings:

"<u>Accountants</u>" shall have the meaning set forth in Section 9.7.

"<u>Acquisition Agreement</u>" shall mean the Asset Purchase Agreement including all exhibits and schedules thereto dated as of December 9, 2004 by and among ArvinMeritor OE, LLC, a Delaware limited liability company ("<u>Seller</u>") as seller, the Company, as purchaser and Viking, as the purchaser guarantor.

"<u>Affiliate</u>" of any Person shall mean (a) any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director or officer of such Person, (ii) any Subsidiary of such Person or (iii) of any Person described in clause (a) above.  For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote twenty percent (20%) or more of the securities having ordinary voting power for the election of directors of such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"<u>Agent</u>"  shall have the meaning set forth in the Senior Loan Agreements and any replacement Agent thereunder.

"<u>Anti-Terrorism Laws</u>" shall mean any laws relating to terrorism or money laundering, including Executive Order No. 13224, the USA Patriot Act, the laws comprising or implementing the Bank Secrecy Act, and the laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing laws may from time to time be amended, renewed, extended, or replaced).

"<u>Authority</u>" shall have the meaning set forth in Section 4.18(d) hereof.

"<u>Blocked Account Agreements</u>" shall have the meaning set forth in the Senior Loan Agreements.

"<u>Blocked Person</u>" shall have the meaning assigned to such term in Section 5.23(b) hereof.

"<u>Borrowing Base Certificate</u>" shall have the meaning set forth in the Senior Loan Agreements.

"<u>Business Day</u>" shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in Cleveland, Ohio.

-2-

"Capital Expenditures" shall mean any expenditure made or liability incurred which is, in accordance with GAAP, treated as a capital expenditure and not as an expense item for the year in which it was made or incurred, as the case may be.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Sections 9601 et seq.

"Change of Control" shall mean (a) the occurrence of any event (whether in one or more transactions) which results in (i) Patrick James, Mike Klingensmith and Jay Schabel or any of them ceasing to own collectively more than fifty percent (50%) of the ownership interests of Holdings with full right to vote such ownership interests or otherwise ceasing to control Holdings, or (ii) Holdings ceasing to own one hundred percent (100%) of the ownership interests of the Company with full right to vote such ownership interests or otherwise ceasing to control the Company, or (b) any merger or consolidation of or with the Company in which the Company is not the surviving party or sale of all or substantially all of the property or assets of the Company.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including, without limitation, all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other similar governmental authority, domestic or foreign (including, without limitation, the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon the Collateral, the Company or any of its Affiliates.

"Closing Date" shall mean December 9, 2004 or such other date as may be agreed to by the parties hereto.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time and the regulations promulgated thereunder.

"Collateral" shall mean and include:

(a)     all Receivables;

(b)     all Equipment;

(c)     all General Intangibles;

(d)     all Inventory;

(e)     all Investment Property;

(f)     all Real Property;

-3-

(g)      all of the Company's right, title and interest in and to (i) its respective goods and other personal property including, but not limited to, all merchandise returned or rejected by Customers, relating to or securing any of the Receivables; (ii) all of the Company's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lien or, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to the Company from any Customer relating to the Receivables; (iv) other property, including warranty claims, relating to any goods securing this Agreement; (v) all of the Company's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts including, but not limited to, the Blocked Accounts, letters of credit, and money; (vi) all commercial tort claims (whether now existing or hereafter arising); (vii) if and when obtained by the Company, all real and personal property of third parties in which the Company has been granted a lien or security interest as security for the payment or enforcement of Receivables; and (viii) any other goods or personal property, if any, in which the Company may hereafter in writing grant a security interest to the Purchaser hereunder, or in any amendment or supplement hereto or thereto, or under any other agreement between the Purchaser and the Company;

(h)      all of the Company's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by the Company or in which it has an interest), computer programs, tapes, disks and documents relating to (a), (b), (c), (d), (e), (f) or (g) of this definition; and

(i)      all proceeds and products of (a), (b), (c), (d), (e), (f), (g) and (h) in whatever form, including, but not limited to:  cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

"Collateral Assignment" shall mean the Collateral Assignment of Contract Rights of Company in favor of the Purchaser with respect to the Acquisition Agreement, together with all extensions, renewals, amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"Collection Accounts" shall have the meaning set forth in the Senior Agreements.

"Consents" shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of governmental authorities and other third parties, domestic or foreign, necessary to complete the transactions and carry on the Company's business, including, without limitation, any Consents required under all applicable federal, state or other applicable law.

"Controlled Group" shall mean all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with the Company, are treated as a single employer under Section 414 of the Code.

-4-

"Customer" shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with the Company, pursuant to which the Company is to deliver any personal property or perform any services.

"Default" shall mean an event which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning set forth in Section 3.1(b).

"Dollar" and the sign "$" shall mean lawful money of the United States of America.

"EBITDA" shall mean for any fiscal period the sum of (i) net income (or loss) of the Company for such period (excluding extraordinary gains), plus (ii) all interest expense of the Company for such period, plus (iii) all charges against or minus credits to income of the Company for such period for federal, state and local taxes, plus (iv) depreciation expenses of the Company for such period, plus (v) amortization expenses of the Company for such period.

"Environmental Complaint" shall have the meaning set forth in Section 4.18(d) hereof.

"Environmental Laws" shall mean all federal, state and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances and the rules, regulations, policies, guidelines, decisions, orders and directives of federal, state and local governmental agencies and authorities with respect thereto.

"Equipment" shall mean and include all of the Company's goods (other than Inventory) whether now owned or hereafter acquired and wherever located including, without limitation, all equipment, machinery, apparatus, vehicles, fittings, furniture, furnishings, fixtures, parts, accessories and all replacements and substitutions therefor or accessions thereto.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

"Event of Default" shall mean the occurrence of any of the events set forth in Article X hereof.

"Executive Order No. 13224" shall mean the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Existing Purchase Agreement" shall have the meaning set forth in the recitals.

"Fixed Charge Coverage Ratio" shall mean and include, with respect to any fiscal period, the ratio of (a) EBITDA minus Capital Expenditures that were not specifically funded by Indebtedness (other than a Revolving Advance) of the Company with respect to such period, minus cash taxes paid of the Company with respect to such period, minus cash dividends and distributions of the Company with respect to such period as permitted by Section 7.10 to (b) Fixed Charges.

"Fixed Charges" shall mean, with respect to any fiscal period, the sum of (a) interest expense of the Company with respect to such period, plus (b) scheduled principal payments on the Term Loan and other Indebtedness of the Company with respect to such period.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"General Intangibles" shall mean and include as to the Company all of the Company's general intangibles, whether now owned or hereafter acquired including, without limitation, all payment intangibles, choses in action, causes of action, corporate or other business records, inventions, designs, patents, patent applications, equipment formulations, manufacturing procedures, quality control procedures, trademarks, service marks, trade secrets, goodwill, copyrights, design rights, software, computer information, source codes, codes, records and dates, registration, licenses, franchises, customer lists, tax refunds, tax refund claims, computer programs, all claims under guaranties, security interests or other security, held by or granted to the Company to secure payment of any of the Receivables by a Customer (other than to the extent covered by Receivables), all rights of indemnification and all other intangible property of every kind and nature (other than Receivables).

"Governmental Body" shall mean any nation or government, any state or other political subdivision thereof or any entity exercising the legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Guarantor" any Person who may hereafter guarantee payment or performance of the whole or any part of the Obligations and "Guarantors" means collectively all such Persons.

"Guaranty" shall mean any guaranty of the obligations of the Company executed by a Guarantor in favor of the Purchaser for its benefit, together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"Hazardous Discharge" shall have the meaning set forth in Section 4.18(d) hereof.

"Hazardous Substance" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, lead-based paint, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or toxic substances or related materials as defined in CERCLA, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, et seq.), RCRA, the Toxic Substances Control Act, as amended (15 U.S.C. Section 2601 et seq.) or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"Hazardous Wastes" shall mean all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws now in force or hereafter enacted relating to hazardous waste disposal.

"Hedging Contracts" shall mean foreign exchange contracts, currency swap agreements, futures contracts, interest rate protection agreements, interest rate future agreements, interest rate swap agreements, interest rate cap agreements, interest rate collar agreements, option agreements or any other similar hedging agreements or arrangements entered into by the Company in the ordinary course of business and not for speculative purposes.

"Hedging Obligations" shall mean all liabilities of the Company under Hedging Contracts.

"Holdings" shall mean CCG Holdings, LLC, an Ohio limited liability company and the sole member of the Company.

"Holdings Guaranty" shall mean that Guaranty dated the dated hereof, by and between Holdings and the Purchaser.

"Holdings Pledge Agreement" shall mean that Pledge Agreement dated the dated hereof, by and between Holdings and the Purchaser.

"Indebtedness" of a Person at a particular date shall mean any and all indebtedness, obligations or liabilities (whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several) of such Person for or in respect of: (i) borrowed money, (ii) amounts raised under or liabilities in respect of any note purchase or acceptance credit facility, (iii) reimbursement obligations (contingent or otherwise) under any letter of credit, (iv) Hedging Obligations, (v) any other transaction (including forward sale or purchase agreements, capitalized leases and conditional sales agreements) having the commercial effect of a borrowing of money entered into by such Person to finance its operations or capital requirements (but not including trade payables and accrued expenses incurred in the ordinary course of business which are not represented by a promissory note or other evidence of indebtedness and which are not more than sixty (60) days past due), (vi) any guaranty of Indebtedness for borrowed money, and (vii) all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person. Any indebtedness of such Person resulting from the acquisition by such Person of any assets subject to any Lien shall be deemed, for the purposes hereof, to be the equivalent of the creation, assumption and incurring of the indebtedness secured thereby, whether or not actually so created, assumed or incurred.

"Ineligible Security" shall mean any security which may not be underwritten or dealt in by member banks of the Federal Reserve System under Section 16 of the Banking Act of 1933 (12 U.S.C. Section 24, Seventh), as amended.

"Intercreditor Agreement" shall the Intercreditor and Subordination Agreement, dated of even date herewith, entered into by and among the Purchaser, the Agent and the Company, together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof.

-7-

"Interest Coverage Ratio" shall mean and include, with respect to any fiscal period, the ratio of (a) EBITDA minus Capital Expenditures that were not specifically funded by Indebtedness (other than a Revolving Advance) of the Company with respect to such period, minus taxes paid in cash by the Company with respect to such period, minus cash dividends and distributions made by the Company with respect to such period as permitted by Section 7.10 to (b) Interest Expense.

"Interest Expense" means, for any period, the aggregate of all interest paid or accrued by the Company during such period, including all interest, fees and costs payable with respect to the Indebtedness of the Company (other than fees and costs that may be capitalized as transaction costs in accordance with GAAP consistently applied) and the interest portion of capitalized lease payments, all as determined on a consolidated basis in accordance with GAAP consistently applied.

"Inventory" shall mean and include as to the Company all of the Company's now owned or hereafter acquired goods, merchandise and other personal property, wherever located, to be furnished under any consignment arrangement, contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in the Company's business or used in selling or furnishing such goods, merchandise and other personal property, and all documents of title or other documents representing them.

"Investment Property" shall mean and include as to the Company, all of the Company's now owned or hereafter acquired securities (whether certificated or uncertificated), securities entitlements, securities accounts, commodities contracts and commodities accounts.

"IPO" shall mean the sale in a firm commitment underwritten public offering registered under the Securities Act of 1933 of the Company's (or its corporate successor's) or Holdings' (or its corporate successor's) equity securities.

"Leverage Ratio" shall have the meaning set forth in Section 6.6 hereof.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including, without limitation, any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Lockboxes" shall have the meaning set forth in the Senior Loan Agreements.

"Lockbox Bank" shall have the meaning set forth in the Senior Loan Agreements.

"Management Fee Subordination Agreement" shall mean the Management Fee Subordination Agreement dated of even date herewith among Viking, the Purchaser and the Company, together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof.

-8-

"Material Adverse Effect" shall mean a material adverse effect on (a) the financial condition, results of operations, business or other conditions of the applicable Person or Persons, (b) the Company's ability to pay the Obligations in accordance with the terms thereof, (c) the value of the Collateral, or the Purchaser's Liens on the Collateral or, subject to Permitted Encumbrances, the priority of any such Lien or (d) the practical realization of the benefits of the Purchaser's rights and remedies under this Agreement and the Other Documents.

"Member Tax Distributions" shall mean dividends and distributions made by Company to Holdings or its members in an amount not in excess of the applicable federal, state and local income tax liability of Holdings or its members (assuming the highest combined tax rate then applicable to Holdings or its members) resulting solely from their direct or indirect ownership of the ownership interests of the Company. Such dividends and distributions shall be made to Holdings or its members at such time as Holdings or its members have an obligation to make tax payments (including required estimated tax payments) with respect to their respective federal, state and local income taxes and shall not be prepaid in advance of such liability by more than five (5) Business Days.

"Monthly Payment Date" shall mean each first day of each calendar month occurring after the Closing Date, commencing January 1, 2005.

"Mortgage" shall mean the mortgage on the Real Property of the Company located at 17th Street, Columbus, Indiana, securing the amount of $10,500,000, together with all extensions, renewals, amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA.

"National City Bank" shall mean National City Bank, a national banking association, and its successors and assigns.

"Net Worth" shall mean, as of any date of the determination, the difference between (a) the aggregate amount of all assets of the Company as may be properly classified as such in accordance with GAAP consistently applied, minus (b) the aggregate amount of all liabilities of the Company properly classified as such in accordance with GAAP.

"Note" shall have the meaning set forth in Section 2.1.

"Obligations" shall mean and include any and all loans, advances, debts, liabilities, obligations, covenants and duties (absolute, contingent, matured or unmatured) owing by the Company to the Purchaser or to any other direct or indirect subsidiary or affiliate of the Purchaser of any kind or nature, present or future (including, without limitation, any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Company, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, arising under (i) this Agreement, any Other Document or any agreement or document executed and delivered in connection therewith, whether or not for the payment of money, whether arising by reason of an

-9-

extension of credit, opening of a letter of credit or loan, and (ii) any amendments, extensions, renewals or increases and all costs and expenses of the Purchaser incurred in the documentation, negotiation, modification, enforcement, collection, perfection of Liens, protection or collection of Collateral or otherwise in connection with any of the foregoing, including but not limited to, reasonable attorneys' fees and expenses and all obligations of the Company to the Purchaser to perform acts or refrain from taking any action.

"Operating Agreement" shall mean that Operating Agreement of Columbus Components Group, LLC dated as of December 1, 2004, made and entered into by CCG Holdings, LLC, its sole member.

"Other Documents" shall mean the Note, the Intercreditor Agreement, the Management Fee Subordination Agreement, the Collateral Assignment, the Questionnaire, the Mortgage, the Patent, Trademark and Copyright Security Agreement, the Collateral Assignment, the Holdings Pledge Agreement, the Holdings Guarantee, the Viking Security Agreement, the Viking Guarantee and any and all other agreements, instruments and documents, including, without limitation, guaranties, pledges, powers of attorney, consents, and all other writings heretofore, now or hereafter executed by the Company, Holdings or Viking and/or delivered to Purchaser in respect of the transactions contemplated by this Agreement.

"Parent" of any Person shall mean a corporation or other entity owning, directly or indirectly at least fifty percent (50%) of the shares of stock or other ownership interests having ordinary voting power to elect a majority of the directors or managers of the Person, or other Persons performing similar functions for any such Person.

"Patent, Trademark and Copyright Security Agreement" shall mean the Patent, Trademark and Copyright Security Agreement in substantially the form of Exhibit B executed and delivered by the Company for the benefit of the Purchaser.

"PBGC" shall mean the Pension Benefit Guaranty Corporation.

"Permitted Encumbrances" shall mean (a) Liens in favor of the Purchaser; (b) Liens in favor of the Agent pursuant to the Senior Loan Agreements; (c) the Liens for taxes, assessments or other governmental charges not delinquent or being contested diligently in good faith and by appropriate proceedings and with respect to which proper reserves have been taken by the Company in accordance with GAAP; provided, that, such Liens shall have no effect on the priority of the Liens in favor of the Purchaser or no material effect on the value of the assets in which the Purchaser has such a Lien, and a stay of enforcement of any such Lien shall be in effect; (d) deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance or general liability or product liability insurance; (e) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, performance bonds, surety and appeal bonds and other obligations of like nature arising in the ordinary course of the Company's business; (f) mechanics, workers, materialmen's, warehousemen's, common carriers, landlord's or other like Liens arising in the ordinary course of the Company's business with respect to obligations which are not due or which are being contested in good faith by the Company; (g) Liens placed upon equipment and real estate assets acquired to secure a portion of the purchase price thereof,

provided that (x) any such lien shall not encumber any other property of the Company other than insurance and other proceeds of such equipment and real estate and (y) the aggregate amount of Indebtedness secured by such Liens incurred as a result of such purchases during any fiscal year shall not exceed the amount provided for in Section 7.6; (h) zoning restrictions, easements, encroachments, rights of way, restrictions, leases, licenses, restrictive covenants, conditions, reservations and other similar title exceptions or Liens affecting Real Property, none of which materially impairs the contemplated use of such Real Property by the Borrower or the current value thereof; (i) attachment and judgment liens which do not constitute an Event of Default under Section 10.6; (j) Liens and exceptions to title disclosed on Schedule 1.2 provided that the principal amount secured thereby is not hereafter increased, and no additional assets become subject to such Lien.

"Person" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or government (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA, maintained for employees of the Company or any member of the Controlled Group or any such Plan to which the Company or any member of the Controlled Group is required to contribute on behalf of any of its employees.

"Projections" shall have the meaning set forth in Section 5.7(a) hereof.

"Purchaser" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"Questionnaire" shall mean the documentation information questionnaire and the responses thereto provided by the Company and delivered to the Purchaser.

"Real Property" shall mean all real property, both owned and leased, of the Company.

"Receivables" shall mean and include, as to the Company, all of the Company's accounts, contract rights, instruments (including those evidencing indebtedness owed to the Company by their Affiliates), documents, chattel paper (including electronic chattel paper), general intangibles relating to accounts, drafts and acceptances, credit card receivables, and all other forms of obligations owing to the Company arising out of or in connection with the sale or lease of Inventory or the rendition of services (including, but not limited to, tolling arrangements), all supporting obligations, guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to the Purchaser hereunder.

"Releases" shall have the meaning set forth in Section 5.10(c) (i) hereof.

"Reportable Event" shall mean a reportable event described in Section 4043(b) of ERISA or the regulations promulgated thereunder.

"Senior Indebtedness" shall have the meaning set forth in the Intercreditor Agreement.

"Senior Loan Agreements" shall mean Revolving Credit, Term Loan and Security Agreement dated as of December 9, 2004 among the Company, the Lenders listed therein and the Agent, and all other promissory notes, agreements, documents and instruments executed and/or delivered in connection therewith or related thereto, as may be amended, modified, supplemented, extended, renewed, restated or replaced.

"Subsidiary" shall mean a corporation or other entity of whose shares of stock or other ownership interests having ordinary voting power (other than stock or other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the directors of such corporation, or other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person.

"Supply Agreement" shall mean the Supply Agreement including all exhibits and schedules thereto dated as of December 9, 2004 by and between the Seller and the Company.\

"TD Center Assets" shall mean_the Equipment used by the Company in connection with its tool hardening services and identified as item numbers 304 through 312 on the Equipment appraisal received by the Purchaser prior to the Closing Date.

"Termination Event" shall mean (i) a Reportable Event with respect to any Plan or Multiemployer Plan; (ii) the withdrawal of the Company or any member of the Controlled Group from a Plan during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA; (iii) the providing of notice of intent to terminate a Plan in a distress termination described in Section 4041(c) of ERISA; (iv) the institution by the PBGC of proceedings to terminate a Plan or Multiemployer Plan; (v) any event or condition (a) which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan, or (b) that may result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA; or (vi) the partial or complete withdrawal within the meaning of Sections 4203 and 4205 of ERISA, of the Company or any member of the Controlled Group from a Multiemployer Plan.

"Transactions" shall have the meaning set forth in Section 5.7 hereof.

"Transition Services Agreement" shall mean the Transition Services Agreement including all exhibits and schedules thereto dated as of December 9, 2004 by and between the Seller and the Company.

"Uniform Commercial Code" shall mean the Uniform Commercial Code or other similar law of the State of Ohio as in effect on the date of this Agreement and as amended from time to time.

"USA Patriot Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Viking" shall mean PMJ Management, LLC, doing business as Viking Management, an Ohio limited liability company.

"Viking Guaranty" shall mean that Guaranty dated the dated hereof, by and between Viking and the Purchaser.

"Viking Security Agreement" shall mean that Security Agreement dated the dated hereof, by and between Viking and the Purchaser.

"Waivers" shall mean, collectively, any and all Landlord's Waivers, Warehouseman's Waivers, Creditor's Waivers, Landlord's Waiver and Agreements, Mortgagee Waivers and Processing Facility Waivers, executed and delivered in connection with this Agreement, in form and substance satisfactory to the Purchaser, together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof.

1.3     Uniform Commercial Code Terms.

All terms used herein and defined in the Uniform Commercial Code as adopted in the State of Ohio from time to time shall have the meaning given therein unless otherwise defined herein.  To the extent the definition of any category or type of Collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

1.4     Certain Matters of Construction.

The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Any pronoun used shall be deemed to cover all genders.  Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa.  All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.  Unless otherwise provided, all references to any instruments or agreements to which the Purchaser is a party, including, without limitation, references to any of the Other Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof.

2.     AUTHORIZATION AND CLOSING.

2.1     Authorization of the Note.

The Company has authorized the issuance and sale to the Purchaser of its 15% Senior Subordinated Note due 2009 in an aggregate principal amount of $6,000,000, in form and substance as set forth in Exhibit A attached hereto (the "Note", which term shall also include any notes delivered in exchange or replacement therefore and as amended, supplemented, renewed, refunded, extended or otherwise modified from time to time).

-13-

    2.2    <u>Purchase and Sale of the Note</u>.

At the Closing, the Company shall sell to the Purchaser and, subject to and in reliance on the representations, warranties, terms and conditions set forth herein, the Purchaser shall purchase from the Company the Note for a purchase price equal to $6,000,000.

    2.3    <u>Closing Fee</u>.

At the Closing, the Company shall deliver to the Purchaser immediately available funds by wire transfer to accounts designated by the Purchaser prior to Closing in the amount of $120,000.

    2.4    <u>The Closing</u>.

The closing of the purchase and sale of the Note to the Purchaser (the "<u>Closing</u>") shall take place at the offices of Benesch, Friedlander, Coplan & Aronoff LLP, 2300 BP Tower, 200 Public Square, Cleveland, Ohio 44114 or such other location as agreed to by the Company and the Purchaser, commencing at 10:00 a.m. local time, on December 9, 2004 upon satisfaction of all of the conditions described in <u>Section 8</u> (the "<u>Closing Date</u>"). At the Closing, the Company will deliver to the Purchaser the Note, dated the Closing Date and registered in the name of the Purchaser (or in the name of the nominee of the Purchaser), in the principal amount of $6,000,000, in consideration for delivery by the Purchaser to the Company of immediately available funds by wire transfer to an account designated by the Company prior to the Closing in the aggregate amount of the purchase price therefor. If at the Closing the Company shall fail to tender the Note as provided in this <u>Section 2.4</u>, or any of the conditions specified in <u>Section 8</u> shall not have been fulfilled to the Purchaser's reasonable satisfaction, the Purchaser shall, at its election, be relieved of all further obligations hereunder, without thereby waiving any other rights it may have by reason of such failure or such nonfulfillment.

3.    <u>TERMS OF THE NOTE</u>.

    3.1    <u>Interest</u>.

    (a)    <u>Interest Rate; Payment</u>. The Note shall bear interest (based on a 365 or 366-day year and the actual days elapsed) on the unpaid principal amount thereof until due at the rate of 15.0% per annum, which shall be payable in cash monthly in arrears on each Monthly Payment Date in each year, commencing January 1, 2005.

    (b)    <u>Default Rate of Interest</u>. At the option of the Purchaser and upon notice to the Company, during the continuance of an Event of Default, principal and, to the extent permitted by law, overdue interest in respect of the Note shall, in each case, bear interest, payable on demand in cash, at a rate 2% per annum higher than the rate of interest otherwise applicable hereunder, or such lower rate as then may be the maximum rate permitted by applicable law.

    (c)    <u>Maximum Legal Rate of Interest</u>. Nothing in this Agreement or in the Note shall require the Company to pay interest at a rate in excess of the highest rate permitted by applicable law.

3.2     <u>Redemption; Repurchase</u>.

(a)     <u>Redemption at Maturity</u>.  The Note shall be due and payable in full on December 9, 2009 (the "<u>Maturity Date</u>").  On the Maturity Date or upon any earlier acceleration of the maturity of the Note as provided for under the terms of this Agreement, the Company shall redeem the Note by paying an amount in immediately available funds (in Dollars) equal to (i) the principal amount of the Note, plus (ii) all accrued and unpaid interest thereon, plus (iii) the Yield Maintenance Amount (as defined below), if any, plus (iv) the Success Fee (as defined below).

(b)     <u>Voluntary Redemptions</u>.

(i)     The Company shall have the right at any time, upon not less than 10 nor more than 60 days' prior written notice sent to the Purchaser (the "<u>Redemption Date</u>"), to redeem the Note in whole or in part, in an amount specified in such notice, by payment of (i) the principal amount of the Note (or in a minimum amount of $500,000 and integral multiples of $100,000 in excess of such amount) to be redeemed, plus (ii) all accrued and unpaid interest thereon through the date of such redemption, plus (iii) if such redemption redeems the Note in full, the Success Fee, <u>plus</u> (iv) if such Redemption occurs prior to the third anniversary of the Closing Date, an amount equal to the aggregate amount of interest that would have accrued on the principal amount of the Note being redeemed from the Redemption Date to and including the third anniversary of the Closing Date (the "<u>Yield Maintenance Amount</u>").

(ii)     Once a notice has been delivered pursuant to this <u>Section 3.2(b)</u>, the aggregate principal amount of the Note, together with the accrued and unpaid interest thereon, the Success Fee and the Yield Maintenance Amount, if any, shall become due and payable on the payment date specified in such notice.

(c)     <u>Mandatory Redemptions</u>.

The Company shall redeem the Note in full (the "<u>Mandatory Redemptions</u>", and each a "<u>Mandatory Redemption</u>") at the time of the occurrence of (i) a Change of Control and (ii) an IPO.

(d)     <u>Success Fee</u>.

If the Note is repaid or redeemed in full prior to the Maturity Date, the "<u>Success Fee</u>" to be paid by the Company to the Purchaser on the date of such repayment shall be equal to $3,000,000.  If the Note is repaid or redeemed in full on or after the Maturity Date, the "<u>Success Fee</u>" to be paid by the Company to the Purchaser on the date of such repayment shall be equal to $4,500,000.

3.3     <u>Payments</u>.

Payments of principal, interest and premium, if any, on the Note shall be made in Dollars (a) without setoff or counterclaim, (b) directly by wire transfer to an account designated in writing by the Purchaser, and (c) without any presentment or notation of payment.  Any payment to be made to the Purchaser hereunder shall be deemed to have been made on the Business Day that such payment is received by the Purchaser's bank prior to the close of business

of such bank; provided that interest for one day at the interest rate specified in Section 3.1(a) shall be due on the amount of any such payment is received by the Purchaser's bank after 2:00 p.m. (New York local time). Whenever any payment to be made shall be due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest due. Any redemption of the Note pursuant to Sections 3.2(a), 3.2(b), and 3.2(c), and, except as otherwise provided herein, all other payments of principal shall be made pro rata, based on the principal amount then outstanding and held by each Person who is the holder thereof.

       3.4    Certain Taxes.

       (a)    Any and all payments of principal, interest and premium, if any, on the Note shall be made free and clear of, and without deduction or withholding for or on account of, any and all present or future Charges, excluding, in the case of the Purchaser, taxes imposed on or measured by its net income, franchise taxes, taxes on doing business or taxes measured by or imposed upon the overall capital or net worth of the Purchaser, or any branch or affiliate thereof, in each case imposed by the jurisdiction under the laws of which the Purchaser, branch or affiliate is organized or is located, or any nation within which such jurisdiction is located or any political subdivision thereof (all such non-excluded taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and liabilities being hereinafter referred to as "Taxes"). If the Company shall be required by any applicable law to deduct any Taxes from or in respect of any sum payable under, or in respect of, the Note, (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.4), the Purchaser receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Company shall make such deductions, (iii) the Company shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law, and (iv) within 30 days after the date of such payment, the Company shall furnish to the Purchaser the original or a certified copy of a receipt evidencing payment thereof.

       (b)    In addition, the Company agrees to pay any and all present or future stamp, court or documentary taxes and any other excise or property taxes or charges or similar levies which arise from any payment made under the Note or the Other Documents or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, the Note or the Other Documents (hereinafter referred to as "Other Taxes").

       (c)    The Company agrees to indemnify the Purchaser for (i) the full amount of Taxes and Other Taxes (including any Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 3.4) paid by the Purchaser, and (ii) any liability (including additions to tax, penalties, interest and expenses) arising therefrom or with respect thereto, in each case, whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. Payment under this subsection (c) shall be made within 30 days after the date the Purchaser makes a demand therefor.

       (d)    The Purchaser shall use commercially reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to take any reasonable action that would reduce the amount of any Taxes and Other Taxes that may thereafter accrue and which action

would not, in the reasonable judgment of the Purchaser, be otherwise disadvantageous to the Purchaser.

    3.5    <u>Transfer and Exchange of the Note.</u>

        The Company shall keep a register which shall provide for the registration of the Note and the registration of transfers of the Note (the "<u>Note Register</u>"). The principal amount of and stated rate of interest on the Note, the names, addresses and commitments of the Purchaser holding the Note, the transfer of the Note, and the names and addresses of the transferees of the Note shall be registered in the Note Register. No Note may be transferred unless such transfer is recorded in the Note Register, and the transferee thereof has assumed the Purchaser's rights and obligations hereunder. The holder of each Note shall notify the Company in writing at least three days in advance of any transfer or exchange of a Note. Within a reasonable time after such notice to the Company from the Purchaser of its intention to make such transfer or exchange and without expense (other than transfer taxes, if any) to such Purchaser, the Company shall:

        (a)    acknowledge such transfer or exchange by executing an assignment and acceptance agreement;

        (b)    record such transfer or exchange in the Note Register, effective as of the date of such assignment and acceptance agreement; and

        (c)    issue in exchange therefor another Note or Notes as requested by the Purchaser, for the same aggregate principal amount, as of the date of such issuance, as the unpaid principal amount of the Note so surrendered, and having the same maturity and rate of interest, containing the same provisions and subject to the same terms and conditions as the Note so surrendered. Each new Note shall be made payable to such Person or Persons, or assigns, as the Purchaser holding such surrendered Note may designate, and such transfer or exchange shall be made in such a manner that no gain or loss of principal or interest shall result therefrom. The Company shall have no obligation hereunder or under any Note to any Person other than the Purchaser that is the registered holder of each such Note.

    3.6    <u>Replacement of Notes.</u>

        Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of any Note and, if requested in the case of any such loss, theft or destruction, upon delivery of an indemnity bond or other agreement or security reasonably satisfactory to the Company, or, in the case of any such mutilation, upon surrender and cancellation of such Note, the Company will issue a new Note, of like tenor and amount and dated the date to which interest has been paid, in lieu of such lost, stolen, destroyed or mutilated Note.

    3.7    <u>Ranking.</u>

        The Obligations and the rights and remedies of the Purchaser under this Agreement, the Note and the Other Documents shall be senior in right of payment to all obligations of the Company in respect of any Indebtedness, except for the Senior Indebtedness. The Obligations and the rights and remedies of the Purchaser under this Agreement and the

-17-

Other Documents are subject to the terms and provisions of, and are subordinated in right of payment to, the Senior Indebtedness in the manner and to the extent provided in the Intercreditor Agreement.

3.8     Use of Proceeds.

The Company shall apply the proceeds of Note (i) to pay a portion of the consideration required under the Acquisition Agreement, (ii) to pay fees and expenses relating to the Transactions, (iii) for general corporate purposes and (iv) to provide for working capital needs.

4.     COLLATERAL: GENERAL TERMS.

All provisions in this Section 4 are subject to the provisions of the Intercreditor Agreement.

4.1     Security Interest in the Collateral.

To secure the prompt payment and performance to the Purchaser, the Company hereby assigns, pledges and grants to the Purchaser for its benefit a continuing security interest in and to all of its Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located.  The Company shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect the Purchaser's security interest and shall cause its financial statements to reflect such security interest.  The Company shall promptly provide the Purchaser with written notice of all commercial tort claims which could result in a benefit to the Company (whether as a claim or counterclaim), and such notice shall contain the case title together with the applicable court and a brief description of the claim(s).  Upon delivery of each such notice, the Company shall be deemed to hereby grant to the Purchaser a security interest and lien in and to such commercial tort claims and all proceeds thereof.

4.2     Perfection of Security Interest.

The Company shall take all action that may be necessary or desirable, or that the Purchaser requests, so as at all times to maintain the validity, perfection, enforceability and priority of the Purchaser's security interest in the Collateral or to enable the Purchaser to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to, (i) immediately discharging all Liens other than Permitted Encumbrances, (ii) using commercially reasonable efforts to obtain applicable Waivers, as the Purchaser may reasonably request, (iii) delivering to the Purchaser or its agent, endorsed or accompanied by such instruments of assignment as the Purchaser specifies, and stamping or marking, in such manner as the Purchaser specifies, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the Collateral, (iv) entering into warehousing, lockbox and other custodial arrangements satisfactory to the Purchaser as and to the extent required hereunder, and (v) executing and delivering control agreements, instruments of pledge, notices and assignments, in each case in form and substance satisfactory to the Purchaser, relating to the creation, validity, perfection, maintenance or continuation of the Purchaser's security interest in Collateral under the Uniform Commercial Code or other applicable law.  The Purchaser is hereby authorized to file financing statements in accordance

with the Uniform Commercial Code from time to time, including without limitation, "all asset" financing statements. By its signature hereto, the Company hereby authorizes the Purchaser to file against the Company, one or more financing, continuation, or amendment statements pursuant to the Uniform Commercial Code to perfect Liens securing Obligations arising hereunder in form and substance satisfactory to the Purchaser. All charges, expenses and fees the Purchaser may incur in doing any of the foregoing, and any local taxes relating thereto, shall be paid on demand by the Company and until paid shall be added to and become a part of the Obligations secured by the Liens created by the terms of this Agreement or any other agreement between the Purchaser and the Company.

    4.3      Disposition of Collateral.

        The Company shall safeguard and protect all Collateral for the Purchaser's general account and make no disposition thereof whether by sale, lease or otherwise except as may be otherwise permitted under this Agreement; provided however, Company may dispose of obsolete Equipment or Equipment no longer useful in the business of the Company and having a value of not more than $100,000 per disposition or $250,000 in any fiscal year of the Company, and use the proceeds of such dispositions to purchase additional Equipment subject to the security interest of the Purchaser or to pay down the principal amount of the term loan pursuant to the Senior Indebtedness. Notwithstanding the foregoing, the Company shall be permitted to enter into a sale and leaseback transaction with respect to the Real Property subject to the Mortgage, if (a) the Lenders under the Senior Loan Agreements in their discretion consent to the sale and leaseback of such Real Property subject to the Mortgage and (b) the net proceeds of such sale shall be applied (i) first, to the outstanding principal installments of the Term Loan under the Senior Loan Agreements in the inverse order of the maturities thereof in an amount equal to the sum of (x) $2,420,000 plus (y) the amount by which the remaining principal balance of the Term Loan under the Senior Loan Agreements exceeds eighty percent (80%) of the appraised value of the Equipment (as set forth in the appraisal received by Purchaser prior to the Closing Date), and (ii) second, to the Revolving Advances under the Senior Loan Agreement. With respect to any sale of the TD Center Assets as permitted under Section 7.1(b), the net proceeds of such sale shall be applied (i) first, to the outstanding principal installments of the Term Loan under the Senior Loan Agreements in the inverse order of the maturities thereof in an amount equal to sum of (a) eighty percent (80%) of the appraised value of the TD Center Assets (as set forth in the appraisal received by the Purchaser prior to the Closing Date the Borrower), plus (b) the amount by which the remaining principal balance of the Term Loan under the Senior Loan Agreements exceeds eighty percent (80%) of the appraised value of the Equipment.

    4.4      Preservation of Collateral.

        Following the occurrence and during the continuation of a Default or Event of Default in addition to the rights and remedies set forth in Section 11.1 hereof, the Purchaser: (a) may at any time take such steps as the Purchaser deems necessary to protect the Purchaser's interest in and to preserve the Collateral, including the hiring of such security guards or the placing of other security protection measures as the Purchaser may deem appropriate; (b) may employ and maintain at any of the Company's premises a custodian who shall have full authority to do all acts necessary to protect the Purchaser's interests in the Collateral; (c) may lease warehouse facilities to which the Purchaser may move all or part of the Collateral; (d) may use